Good afternoon, your honors. My name is Initial J. Scott Smith. I'm here representing the appellants, Sheriff Downam and Deputy Gregory Stark. I think that one of the things that needs to be remembered in this case is that the plaintiff, by his actions on the evening in question, put Deputy Stark in a fairly difficult position. There can be no doubt that an intoxicated individual operating a motor vehicle presents a grave danger to both himself and others. How do we know he was intoxicated? He had several... Isn't that a subject of dispute here? I don't think so. And the evidence in the case, the only evidence that he was not, well, intoxicated is itself a relative term. But Deputy Stark had observed that he had alcohol in his breath. That's Stark's testimony. And we also have Mr. Dell'Orto's testimony. And we've got, nobody did a breathalyzer, so we never took any kind of analysis to figure out what alcohol content was. We've got a little bit of a he-said, she-said problem, don't we? Well, actually, not, specifically with respect to having alcohol in his breath, we don't have a he-said, she-said. Mr. Dell'Orto admitted in his deposition testimony that... as driving while intoxicated or driving under the influence. That's true. But the question here, first of all, you know, the question about whether or not a breathalyzer was done, that would only be evidence that would be a post hoc justification of the arrest. You can only take a breathalyzer under California law after an individual has already been lawfully arrested. But it certainly would have bolstered Officer Stark's testimony about the behavior of Mr. Dell'Orto, wouldn't it? On the other hand, if we took a blood, if we took his blood alcohol level and found that it was very, very low, it was very minor amounts of alcohol in his blood, that would tend to support Mr. Dell'Orto's testimony that although he had been drinking and that Officer Stark might have detected alcohol on his breath, that he was, that he was not belligerent in any, in any abusive way that would suggest that he was a danger when he got in the car. I actually disagree with that last point, because I think when we're assessing probable cause, we do have to assess it solely with respect to what the officer can view at the scene. Yes, if there was, in terms of what will ultimately go before a jury, and if there is, were as a dispute in the evidence as to, as to Mr. Dell'Orto's conduct at the scene, and there really isn't a dispute in the evidence as to Mr. Dell'Orto's conduct at the scene, we have tape recordings, we have transcriptions that are in the excerpts of record of those. Let me ask you this. As I understand it, this was quite late at night, about what time, 1230 or so? This is between, this whole episode runs between about 1230 to 1 p.m., yes, starting 1 a.m. And this is out of doors? Yes, it is. And was the area in which they were speaking well lit? That isn't particularly clear in the record. The only discussion about lighting in the record is Mr. Dell'Orto's testimony where he says that he could see across the street, he could see what the officer was doing, talking with three yous, although because of the lighting he couldn't initially identify who the three yous were until he moved around. So there was street lighting available, it created some shadows. Yes, so what I'm after is that we have repeated almost formulaic testimony from Officer Stark that he knew that Mr. Dell'Orto was intoxicated because of things like slurring of speech and redness in his eyes. Were the lighting conditions such that he could observe redness? I'm not sure that the record can clearly speak to respond to the... If I were arguing this case on behalf of Mr. Dell'Orto, I'd say, you know what, he's making it all up, and the way I can tell you he's making it all up is that he's talking about redness in his eyes which he could not possibly have observed. Even if we, perhaps, but even if we were to take that aspect out of it, we know that Mr. Stark approached Mr. Dell'Orto, we do know that they were fairly close to each other. Close enough that when Mr. Dell'Orto was speaking over the telephone to the dispatcher, we can hear in those tape recordings Deputy Stark talking in the background. That, they have to be at a fairly, fairly close to each other. So he's going to be able to, whether the eyes are specifically red or just watering, he's going to be able to sense or see that there is, he'll be able to assess from, he was, Mr. Dell'Orto admitted he was close enough to smell his breath. No, but there's no question about what he had been drinking. By his own testimony, he'd had one bourbon and water and I think three glasses of wine. Over a two and a half hour period, that's correct. There's no question about what he'd been drinking. That's correct. So the question is not that. The question is the degree of intoxication and the degree of visible intoxication. That, I agree with that. And when one assesses whether or not an officer has probable cause to make a determination of whether that degree of intoxication meets Section 647F's requirements, which is a danger to himself or others. How much probable cause did he have that Mr. Dell'Orto, in fact, was, once the instruction had been made clear that he's supposed to walk home, that Mr. Dell'Orto was going to disobey that instruction? I'm not sure that the, I, I, and I don't mean to sidestep your question, but I think that the issue about whether the instruction was clear or not is a bit of a red herring. Because the question is, once, once Mr. Dell'Orto was in the vehicle, does Deputy Stark have the probable cause to arrest him? Irrespective of whether or not Deputy Stark's order or direction to him to walk home as opposed to drive home was, was clearly stated. Irrespective of, you know, whether they had a misunderstanding there of their verbiage. The point being is that, is that on the basis of his observed conduct, which includes being told to go home, whether he's, whether it's drive or otherwise, being told to go home by my count in just the transcription of the, of the tapes, at least four times, and Mr., and Mr. Dell'Orto sort of staying with him, going across the street, going up the side, the side of his patrol vehicle, and saying, no, you shouldn't arrest Mr. Brown. That's sort of an, an aggressive, almost belligerent type of behavior. It's certainly non-cooperative. It's the typical behavior of a self-important former Board of Supervisors member. It is also the typical behavior of a sort of self-important Board of Supervisors member who has been drinking and whose judgment is impaired at 1.30 in the morning. I mean, we have to take in, taking in the whole, I mean, this was, Deputy Stark arrives at the scene. He's, there's 20 to 30 people, and that is, that is in the record milling about, of which Mr. Dell'Orto is one. He's already had to deal with one rather clear drunk in Mr. Brown, and now he's, and now he's, he's been told by Mr. Dell'Orto that he has been, that he has been drinking. He can smell alcohol in his breath. He is behaving in a manner that is not consistent with somebody that is being cooperative. And there, and I would add that there's nothing in the record that suggests that Deputy Stark knew that Mr. Dell'Orto was a former member of the Board of Supervisors. Mr. Dell'Orto's testimony was he did not recognize, nor did he know. No, I think, I think that's probably right. There's nothing in the record to suggest that Mr., that Deputy Stark knew that. So, so, so the deputy has an individual who is at, you know, is, is calling the, is, is calling the sheriff's dispatch at 1230 in the morning, demanding to speak with, with the elected sheriff. Is, is. He's referred by his first name. Yeah, he says, he says, I'll catch up with Dennis later at one point. Who follows him back, who he observes, you know, that there is, that he observes with an unsteady gait, that again, has admitted to drinking, has alcohol in his breath. Counsel, all of this is, is a terrific argument to, to make, to make to a jury. And I'm, I'm, I'm confident at the appropriate time that, that you would make that argument and make it very. I'm sorry. I'm sorry. I'm sorry. Trial counsel will make that argument. You'd be a good trial counsel. I'm confident also that, that, that, that Mr. Foley or someone associated with Mr. Foley will, will stand up and say, all of this is also perfectly consistent if we retell the story just slightly with the following, with the following details, we put everybody in the same place. But now what we have is an overbearing police officer who's out of his league with too many people milling about who've been drinking because they're at this festival that's been canceled and, and it's, it's late at night and you've got a responsible citizen, Mr. Brown, who's very unhappy with the way the officer is, is harassing some young boys. He goes offer, offers to give the boys a ride home, to get them off the streets and out of the officer's hair. The officer gets, gets in Brown's face. Del Orto gets in, in the officer's face because he doesn't like the way he's treating his friend, Mr. Brown, and he doesn't think this is appropriate. The former member of the Board of Supervisors knows the sheriff. Now that's a whole different, that's a whole different story. But why isn't that story, why isn't that, why isn't that story, why isn't, why isn't the story of either the overbearing drunk supervisor or the story of the overbearing officer, one that ought to be resolved by a jury? Precisely because that problem will cause determinations once you establish the historic facts are decisions to be made by judges, not juries. And that is, um, and, and, and that, that I think maybe belies. It's made by officers in the field and not judges, preferably. It is made by officers in the field. But the question is, the way this works is, is especially after Saussure, the initial analysis of whether a constitutional violation has occurred has to be made by the, by a district court in a qualified immunity case. And the district judges to take the historic facts and, and that are not in dispute. And what, and, and if I may, Judge Bybee, what you've done is you've taken the same historic facts, and I think that that may have been the comment by Judge Kuczynski, and you've given two different spins or inferences off of those, those historic facts. Well, that, um, is, and I'm going to mispronounce the case. I, it's, um, but I'll get to that and I'll cite you the case in a second, but it's in our briefs. But when you take those historic facts and, and try to draw inferences, if that's something that a judge has to do and has to make the sense of, well, taking all this into consideration, looking at, looking at these admitted historic facts, would a reasonable, or was there reasonable cause to believe, and in this circumstance that Mr. Delorto was sufficiently intoxicated that he was, that he was a danger to himself and others, when you add into the fact that here is somebody who has been drinking, who has been behaving in a way that it is possible to characterize as an overbearing drunk, and who's gotten into a vehicle. That's what gives Mr., that's what gives Deputy Stark the very difficult choice at that point, that, you know, he can either let him go, in which case, you know, he risks that, you know, that, that, that Mr. Delorto, um, you know, drives home and hopefully he drives there, he gets home safely and doesn't crash into anything. Maybe he doesn't even go home, but he's, he's, he's letting somebody who is, who is admitted to drinking, has breath, has, has, um, alcohol in his breath, and has been behaving in a way that is possible to characterize as an overbearing drunk. He's letting that person, you know, drive off. The other option is to exercise the powers under section, um, 647F and arrest the individual because he's chosen to get behind the wheel of a motor vehicle. Oh, I'm sorry, go ahead. I suppose you could have let him drive off, stopped him and made him walk the line. Yes. And if it would have been another option, let him, let him take off. Uh, and as soon as he takes off and then arrest him for the more serious crime. Well, I, I don't know whether he could arrest him, but he is entitled. I'm sorry. I didn't mean to interfere with your question. Just to understand California law. Uh, he is entitled to make him, ask him to walk the line. You said he has to be arrested to get a breathalyzer test. That's correct. But, but he doesn't have to be arrested to be, uh, uh, subjected to other tests for, for, uh, intoxication, like look into the flashlight and, and follow my, my, my finger or, you know, stand there, uh, with your feet together and touch your nose or, you know, can he walk a straight line with, uh, or, or raise a foot? I mean, there's a series of field sobriety tests that can be run without actually arresting somebody. That that's correct. And, and to be clear, I don't, um, I don't think that he would have to, if, if deputy Stark wanted to go the additional step to have Mr. Delorto undergo a field sobriety test. I don't really believe that California law would require him to be, um, you know, be that the arrest would be for a suspicion of drunk driving. That is, he doesn't have to let him go. He, he could have under these circumstances had him undergo a field sobriety test. I'm just not sure where that gets us from a constitutional standpoint, because the field sobriety test would just simply retest the things that deputy Stark has already testified. And the, the record says, um, for which there's actually very little actual dispute in the evidence, um, that he has already testified. What dispute is on the evidence? For example, uh, the officer said that he was staggering. He was unbalanced. Is there a dispute? Is there a contrary test? I mean, there is no contrary testimony on that point in the, in the record, other than the sort of blanket statements by Mr. Delorto, I was not drunk. There is no, there is no testimony that he was, that he walked. Witnesses here? No. And that, um, officer's testimony say I saw him staggering. There's nothing from Mr. Delorto saying I wasn't staggering. All in Mr. Delorto said staggering because he's drunk. He might've been staggering because it was dark. He might've been staggering for any number of reasons. Uh, the fact that he is not drunk doesn't mean he wasn't staggering. He might've, he might've been staggering because he was so mad. He couldn't, couldn't, couldn't walk straight. And, and, and that's, so there's no, no, no dispute on that point. Does he dispute the red eyes? The only testimony on that is, is that he was asked in deposition whether once he got to the jail, when he was at the jail, did you think that you had red eyes? And Mr. Delorto's testimony was, I don't believe so. Um, and that, and in terms of, you know, what was observed at the scene, droopy, watery eyes, there was no testimony or declaration evidence. The only reason this is a hard case for you, uh, is that instead of Mr. Delorto coming over to officer Stark and being an overbearing drunk, Mr. Delorto called on the cell phone to the dispatch and dispatch alerts officer Stark, officer Stark looks around, see who's on a cell phone, sees that Mr. Delorto's on a cell phone, comes over to him and says, are you talking to dispatch? And it's that that begins the confrontation. If officer Stark had not come over to Mr. Delorto, I'm not sure there ever would have been any exchange between them at all. Well, uh, if, if the only thing that had happened in this case had been officer Stark observing a man that he thought was drunk, get into a truck and be about to drive away, officer Stark arrests him in order to prevent him from doing damage and so on, I don't think we'd have a lawsuit. Is that right? Well, I think that first of all, I mean, to, to be clear, the defense standpoint is, is that the events were exactly as you described them for purposes of appeal, for purposes of qualified immunity motion, we have to accept that the plaintiff's version of the events in which he overheard this statement, um, on the, you know, suppose the statement on the radio, um, that, you know, the defendants deny that occurred. But that being said, you deny what occurred? Um, we deny that there was a call over the radio to deputy Stark in the field saying there's somebody complaining about you and that deputy Stark, that was the reason that he approached Mr. Delorto. So you're saying he came over to Mr. Delorto simply because he was on a cell phone? No, he came over to Mr. Delorto because he was trying to disperse the crowd. That is, that would, that would be the position if the case was going to trial. I concede for purposes, for our purposes, we have to accept the version that you just described, but that doesn't change the fact that he still got there, that they still came together for whatever reason. Um, the subjective motives of course, deputy Stark are irrelevant, um, to the question of, of probable cause. Well, that may be right, but it may very well be helpful to a jury in determining whether or not there was probable cause in terms of how much they're going to trust officer Stark's testimony about whether he had all this appearance of being drunk. Because if officer Stark came out of the blue, saw a man with whom he had no prior contact whatsoever, none of this exchange about, Hey, you're calling dispatch on me and had testified, well, you know, I saw that he was drunk and I did this. They have almost no reason to disbelieve that officer Stark, but because of this other exchange, which for current purposes will believe took place, the jury might well believe that officer Stark is greatly exaggerating his symptoms of drunkenness. Except there's, there has to be, at least for, for our purposes, I think, and especially on a qualified immunity where, you know, the whole point is trying to at an early stage, there has to be some evidence in the record other than just being able to blindly say, well, I don't trust his credibility because there was this confrontation. And the question is, can a jury reasonably distrust the credibility given this narrative that were for present purposes required to accept? I think that the problem with, with, with allowing a case to go forward from summary judgment on that premise, that there is, that there was some confrontation, some reason to disagree, it would allow an awful lot of cases to go, go ahead because there's a lot of arrests that occur under circumstances in which the, the arresting officer and the arrestee, if you will, are, find themselves at odds over any number of things. So, so when we ask ourselves, you know, what, you know, what, what can we look to, to determine probable cause? We have to, we have to find, first of all, there has to be some real dispute in the evidence. And again, they're very, there is very little. If we just, if, if we take away the, the things for which there may be some dispute, the red droopy eyes, we still have an individual who is behaving in an overbearing manner to an officer who is trying to disperse a crowd, who follow, even after this confrontation takes place. If you accept the version of the narrative that I just gave you, I'm not sure he's overbearing. He sees something that he thinks is wrong. He doesn't address the officer one way or the other. He calls dispatch and says, you know what, I know this sheriff, he's a friend of mine, and I think, I think he should know we've got a problem. I mean, he doesn't, he doesn't even talk to officer Stark. But the, the, the overbearing part is, is when officer Stark starts communicating with him and that officer Stark then, you know, has, starts talking to him and he, and he's, and he's saying, you know, hold on there, son, I'm on the phone with your dispatch. And then even after they're, hold on there, son, I read the transcript. Well, I'm, I'm paraphrasing, but he says, he says, you know, I'm on the phone with dispatch or something along the lines of, I'll be right with you. And then in response to, have you been drinking? Yes. How many drinks? Listen, I'm on the phone. Right. And then, and then after the end, and then that follows up with, I need you to go home. He then go, they then go back to the car and by Mr. Delorto's declaration, Mr. Delorto essentially follows him and they have the second recorded conversation in which, you know, in that conversation, Mr. Deputy Stark tells him three times that he needs to go home. And he's sitting there beside the patrol car telling him that he shouldn't arrest Mr. Brown. And that coupled with the fact that, that there had been, that the, the, the, the whole call, the reason he was there was there was lots of people drinking in the street. Mr. Delorto admitted that he was drinking. He had a, he had the smell of alcohol on his breath and he was willing to let him go. He was willing to let him go. But then when he sees him get in the car, he has to make the decision and the decision to protect the safety of the community. Um, my time is up. Um, if the court has any additional questions, although, um, I'd like to have a couple of minutes for rebuttal, particularly about any of the first amendment questions or Monell liability on behalf of the, um, uh, the elected sheriff, we'll hear from those side now. Okay. Thank you. Your honor. Good afternoon. Uh, I'm Ken Foley. I'm here representing, uh, Michael Delorto and I am also the council below, uh, a couple of things I wanted to clarify on what was actually said on excerpts of trends, a record page three 20. There's the, uh, statement in the response to the summary judgment motion where Mr. Delorto told, uh, at his deposition, uh, that he was not under the three 20, three 20 on the excerpt of record. There's tabs. Is that consecutive numbering? Uh, yes, it's volume two. I believe these are not consecutive numbers. You're going to have to give me a tab. They are at the bottom of the pages. It says excerpt Oh three, or there'll be numbers on the bottom of each page. Some of them don't. Some pages. Sorry. If you're page three 20, I've got volume two tab nine. Yes. That's it. If you look up at the lines one through six in our response to disputing that fact, I'm sorry, excerpt three 20. Yes. Okay. Up at the top lines, it's undisputed material fact, and it goes on talking about whether Delorto was intoxicated, bloodshot eyes, red droopy eyelids, et cetera, we put their dispute it. And we cited in the record where Mr. Delorto said he did not have red watery eyes. He did not have slurred speech and he was not intoxicated. He didn't say he wasn't staggering. No, that was never asked one nest. Okay. So, so, I mean, so he didn't dispute that. Uh, correct. It was an inference. If he's not intoxicated, that would mean that he, if he was staggering, it wasn't because of intoxication. Well, uh, in any event, he said multiple times, he was not intoxicated in the reply brief. But he could be staggering. And the officer sees him staggering with alcohol on his breath. Now, whether he's staggering because of a mental condition, the point is the staggering was not disputed. It was not brought up at his deposition. And therefore at the time of doing the opposition, it wasn't addressed. I don't care how it wasn't disputed. You could have put an evidence disputing it. You could have put in his declaration. You could have asked the question of the position that it is not disputed. That was not disputed. Okay. Let's look at, look at, let's look. However, just a minute. Okay. I'm sorry. You have some more on staggering? Well, yes. I wanted to say that at the excerpt of records page one Oh one lines 18 through 23, and that would be in volume one. One Oh one. What's yeah, I got it. What's one Oh one lines 18 to 23. Okay. He was asked after he had finished the wine, if he felt the effects of the drinks and he said he did not feel the effects of the drinks. Therefore, to go back to the staggering, if he did stagger, it wasn't because of any, we have an officer who says the guy admits to drinking alcohol is a breath and you staggered, you don't dispute those three facts now, whether the three connected somehow biologically, whether it was a, uh, whether it was caused by drink or whether it was caused by, uh, you know, he's got clumsy feet or anything else. It doesn't matter whether it was the effect of drunkenness. In fact, isn't relevant. What's relevant is what the officer observed. And these are three facts. You did not, you did not dispute drinking. He does not dispute alcohol and breath. You did not dispute staggering. The fact that he might not have felt the effects of alcohol is either here or there. Right. And then yes, yes. Okay. Now let's talk about, let's talk about do PIs and the like. If you go to page one 68, that sort of record page one 68 binds five through six. Okay. I don't know why you have some of them numbered. Okay. Five and six. Okay. It should say there that, uh, he does not believe his speech was, uh, wait a minute. Don't believe. So you think that's a, that puts the matter in this, go up to line two. I believe it is one 68 lines two through six. Yeah. While he was there, where your eyes are watery. I don't believe so. Correct. Doesn't sound like to me like a denial. Well, he's not looking at his own eyes. So you haven't denied that. Well, so you have the officers testifies on the record under oath. He had watery and do PIs about, let's say I looked in a mirror. He doesn't say he says, I don't believe so. He says, were you slurring your speech? I don't believe so. He doesn't even say no. That doesn't sound like a denial to me. So you've got admission of drunk drinking admission of alcohol on the breath. Absolutely. No dispute as to staggering and the weakest form of denial on watery red eyes and, and, uh, and slurred speech, the kind of denial that to me sounds more like an admission. I don't believe so. Well, if you can know when you have slurred speech, that's something that's something, you know, he's not listening. Do you, I've got a tape before he slurred speech. Believe me, when I, when I, when that happens, people, people know that slurred speech, you can't get the words out. You know, your tongue is, you've been there. I've been there. Let's say, you know, there's no doubt about it. There's no doubt about it. Unless you're so drunk that you can't remember, you know, at the district court, I mean, what you say is if you didn't have slurred speech, you say no. At the district court hearing to dispel this conversation we were having, we played the tape and we listened to the tape statements made by Mr. Delorto and we heard the dispatcher's response and we heard officer Stark and that would dispel any question as to whether he had slurred speech because he didn't have slurred speech. And I have brought that same tape with me. Conversation he had with officer Delorto? That's the conversation with officer Delorto, what he was saying. That's on here too. The whole conversation? The tape conversation that was taped. With him and officer Delorto? The part that was, Delorto had a tape recorder on him. The parts that Delorto taped and the parts that dispatch taped. We have Mr. Delorto's speech here. You can listen to it. It's clear. Is there a finding on this? I mean, well, the finding, the finding in the district court was that officer Stark, on page 18 of the court's decision, they said deputy Stark's deposition testimony is directly contradicted by the transcripts produced by the sheriff's office, indicating either a lack of veracity or recollection on his part. And so I don't know if that you would consider that to be a finding, but it appears that the district court felt that, uh, tape in the record. Well, is it in the record? Is it an exhibit? Is it something that's been, I had called the court about making it an exhibit. Is it in the record? The transcripts are no, this tape, this tape was in, if I wanted to call the district court and get it, would I be able to get it? No, because we stipulated at the hearing, I could retain it. So it was part of the record of the district record, but you, you've obtained. Okay. I retained it. So I could get it by calling the district court. They just called you and get the tape. Or I could give you this one. Cause I made a copy question. All right. The question is, can I get it? Yes. Let's just like any other exhibit. If I want to hear it. Yes. You, and I think you said this, but I want to make sure I heard it properly. Did you play the tape to the district court? Yes. So the district court has heard the tape. Yes. Okay. And you have a transcript of that hearing? Yes. Oh, no. The transcript of that hearing was not included. Excuse me with the record in this case where we played the tape, but the court reporter did not take down the tape at the time we played it. But the point is to dispel the question about slurred speech and behavior and mood and arrogance. If you listen to the tape, I think it'll become quite clear to you that Mr. Dorado was not intoxicated, did not have slurred speech, and he was acting. His ability to recall things was actually better than the officers because the officer said, I told you to walk home and Dorado said, no, you didn't. And Dorado said, or excuse me, Stark said, yes, I did. And then if you listen to the tape, he never told him to walk home. He said, go home or go to jail. That's the options he gave them. He didn't say walk. So Dorado's mind was so sharp at that time doing when an arrest was being the officer was conducting an arrest, going over there and argue with the officer about having. Well, when at the time the arrest was made, the arrest was made at my client's car. My client was there was there was a brown. There was other. That's what happened in the beginning. He saw off. What's he doing? Following the officer to the car and arguing with him about whether the rest is being made. I think I think behavior. Well, I don't think it is. Don't we have a right to question activity? No, I don't think you have a right to get in the middle of an arrest. Well, when he didn't get in the middle of the guy, if the guy is not properly arrested, we have legal processes to to deal with them. Well, you don't stop in the middle of the night and start arguing with an officer who is in the middle of making an arrest. That strikes me as beyond officious. It strikes me as a little dangerous. We can't. California Penal Code one forty eight a one delay for an officer in the performance of his duties. Correct. But making an objection to a police officer about what he's doing in the field is not a one forty eight and the First Amendment right of citizens to object under the middle of an arrest. You walk up to an officer and say, hey, don't arrest this guy. What do you get that? What does your client get that? Well, I'm calling up and ask you to speak to the sheriff in the middle of the night. Well, you know, that was another argument. Bizarre behavior. That argument didn't go very far with me because sheriff's offices are open 24 hours a day. And if you see something wrong happening at 1230, I'm talking to sheriff. I'm a big man. Well, actually, he was talking to the dispatcher to make that kind of he was talking to the dispatcher, though, who put him on hold. And that's the interesting part of this. While he's on hold trying to make his complaint, what's wrong with calling up at 1230 and complaining about something you're watching happen? Insisting on talking to the sheriff. I think that's exaggerated in his declaration, he said he realized Dennis may the sheriff may not be there, but this is somebody who's known the sheriff for umpteen years. So this is not. Suing him now? Well, who went to jail? The sheriff didn't. How big is this town? Well, the county has about thirty five thousand residents. Now, Macomb Hill has about fifteen hundred residents, I'd say. How big is how big is the department? The department has, I think, now about one hundred and five employees is my guess. How many how many how many deputies? How many how many people work for the sheriff? How many officers work for the sheriff? I don't know the exact number, but if I speculate, I'd say probably between 40 and 60. Out of the 105 or so or 120, something like that. Calaveras County? Yes. Jumping frogs. But the district court had a problem with the credibility of Officer Stark, which I think is a critical issue on this appeal, because how can you establish facts, for instance, of whether he had supposed to do? He has this guy who is droopy eyed, watery eyed, slurred speech. He's staggering. Who admits to having drinking was alcohol in his breath. And he gets in his car and puts the key in the ignition. Is he supposed to let him just drive off? But that's not the state of the evidence. He doesn't have red, watery eyes. He doesn't. He doesn't have. I don't believe so. He doesn't have slurred speech. And you have to believe Officer Stark to get there. And the district court said to present evidence disputing what the officer said. You have nothing on the on the on the on the. Well, the drinking is stumbling. You have nothing on the drinking, nothing on the alcohol in the breath. And you're very little on the watery eyes and the slurred speech. Now, given all the situation, the guy in the middle of the night gets into his truck, sticks a key in the ignition, starts the engine. Is he supposed to let him drive off and maybe kill somebody? Well, if he had reasonable cause to believe that he was under the influence, the answer to that question would be no. But he didn't have reasonable cause to believe he was under the influence because he didn't do any of the procedures that are done to determine if somebody is under the influence. Let him go. And then he had to run over one of those people that was running on the street dancing. And there was no gas, but there was no dancing. They've been canceled. Well, but there's still people there that have been there. And there were probably still people, people down the block. And there could have been. And there's a guy and he ran over those people. I mean, what they would have done is they would have sued the sheriff for not for not keeping this guy from driving off. There's immunity. There's no lawsuit for that. There's immunity in the California government code for that. The point is still that they would have blamed they would have blamed this deputy for allowing an obviously drunk man to go off. Well, but your argument is he was not obviously drunk. Your argument is he was not drunk at all. And the officer did nothing to determine if he was impaired for the purpose of driving a vehicle. He could have given him a pass test, something to blow in on the side of the road to determine if he was a risk. He could have had him do field sobriety test. He could have done a lot of things to try to determine in his condition. In Calaveras County, there's a policy for the sheriff to turn over DUIs to the CHP. So had he arrested him for DUI, he would have had to have had a highway patrol officer come in who would have then done all the tests and written up the arrest. So that didn't happen because the officer never requested any of it and never did any of it. And why didn't he do it? Well, look at how this starts. And I gave you some supplemental authorities on I guess the defendant has cited one line of cases and it looks like the Ninth Circuit has cited Hainsworth on several occasions about when you get into the First Amendment claim and how close is the interference with the right to the exercise of the First Amendment right. And in this case, they're at the same time. You can't get any closer than that. And what a coincidence. He's on the phone complaining to dispatch. And lo and behold, a couple of minutes later, he gets arrested with no other test, no other facts. Just the just that is hanging over everybody's head. And under Hainsworth. You think calling a dispatcher is the First Amendment protected activity? The right to complain about a police officer is not only a First Amendment right in California now, it's absolutely privileged. There's an absolute privilege on whatever you say when you call the sheriff. Dispatcher, the supervisor. Well, you have to start someplace. So he knows the sheriff. I don't it's not in the record whether he knows his home phone number or not. He doesn't have to complain on the spot. I mean, he can complain about it at a later point. What I'm saying is I thought what you have to do is complain to a supervisor, somebody who's in charge of the officer. You can't just say, well, if he could get there in this particular case, he was put on hold until Stark located him. And then they came back on the line after Deputy Stark had located him. And I found that to be a rather amazing coincidence. And the dispatcher says this kind of curious remark, I kind of thought it was you. Right. Which indicates that they had received a complaint, although the tape recordings didn't have that in it. For some reason, the tapes we received from the sheriff's department started later in the conversation. The beginning of Mr. Delorto's conversation was not recorded. The part where he made his complaint, or at least it wasn't on the tape. I infer something else from the dispatcher's comment to Stark. When the dispatcher says to Deputy Stark, I kind of thought it might be you. I think that can be used to suggest that the dispatcher knew Stark's proclivities. And if he's going to get a complaint about somebody, it may well be Stark. Well, I kind of thought when he said thanks to the dispatcher, he was saying thank you for the cheap shot, which is how I took it. When you listen to the tape, you can draw your own inference from it. The another thing I just wanted to mention before my time is up, I'm very close here, is that during Deputy Stark's deposition in the excerpts of record, when I was taking his deposition, he said inconsistent statements repeatedly, and they went to the heart of the case as to when he knew there was a complaint. And at his deposition in the excerpt of record, page 231, line 20, he denied knowing that there had been a call to the sheriff's office complaining about him that night. And we refer to the fact that the tape says, Del Ordo says, I'm talking to dispatch now. So he had to know. And when the dispatcher. But why does he have to know? Because Del Ordo told him. It's on the tape. I'm sorry? Because Del Ordo told Stark, I'm talking to dispatch. But that doesn't necessarily say that Stark knew that Del Ordo was talking about Stark. Well, when the dispatcher. There was a complaint about about Stark. When the dispatcher says, I thought that you they were talking about. Obviously, that infers something had something critical had been said about him or some criticism. You're trying to say Stark lied when he said he didn't know there was a complaint. Correct. How does this show that he lied? Because he also said that that same deposition that he had been told of the call to the sheriff's department that night, which is a 220 excerpt of record 224 19 through 26. But then he said it another time that he found out about the complaint two days later. That was on page 233. Excerpt of transfer. But you can know about the call. You need to know about the complaint. You can you don't you don't know that there's a complaint about you or the call concerns you at all. Where's the but here? How do the two things contradict each other? Because the coincidence of a complaint being made to the sheriff's department. And Mr. Del Ordo being arrested without any tests or procedures. And now you don't answer my question. You said he contradicted himself. He did want to demonstrate to me how he contradicted himself. I didn't see a contradiction in his testimony. You show me again where there's a contradiction or tell me there's no contradiction. One of those things. Well, he admitted he knew there was a call to dispatch. Right. OK. He says two days later, I found out it was a complaint. Where are the two things contradictory? Well, as you say, I knew there was somebody calling complaining about me at one point. And then later on, it says I didn't find out about him two days later. You can know there's a call to the dispatcher. You don't know to know there's a complaint. Right. Well, unless when the dispatcher says, I thought that was you that he was talking about. OK. That still doesn't say it was a complaint. OK. Well, something was being said about him while he was making an arrest. And while there was a citizen nearby saying he didn't think the arrest was appropriate. Where's the contradiction? Because you say he must have lied or he must have not remembered or something because he says he didn't find out about the complaint until a couple of days later. Well, I believe a reasonable inference from these events and those statements is that officers start arguing that to a jury. But he wanted to argue contradiction. He wanted to say, gee, look at this. He ate his words. I hope I get that chance. Thank you. And on this tape, I'm willing to stipulate that if the court would like to receive it now, I'll be happy to provide it to the clerk. Thank you. We'll give a couple of minutes. I'll be very brief, Your Honor. Just a real quick point on the last point. If the court truly considers that to be an important concern, I would recommend to read the deposition testimony of Deputy Stark, which is tab. Oh. I be of the excerpts of record pretty closely because I think that there was a lot of confusion in terms of his deposition testimony, the order of events. And as I read his deposition testimony, when he when he first said, I didn't know about a complaint being made, he was saying that he was referring to at the time that he first contacted the Mr. Delorto, which is consistent with what I was explaining. Our position would be a trial. We have to, of course, for our purposes, accept a different course of events. But that's the he had no what he's saying is, is when I went and first contacted him, I didn't know that he was complaining or anything. And it's in the process. And his testimony was, as I understand it, in the process of that communication. That's when Delorto informs him he's on the on on the phone with dispatch. That's what causes Deputy Stark to then radio dispatch, which we do. Clearly, we have two tapes of that and transcripts of that, which Deputy Stark says, hey, the guy that you're talking to, does he sound inebriated to you as well? To which the dispatcher responds, but you're but you're stuck with, for example, Delorto's deposition, where he says, I then heard the dispatcher say over the deputy's radio that someone was complaining about a deputy and I don't know how to pronounce it. Malik me. How do you follow me? McCallum Hill. Yeah. Yeah. So I got it for the present purpose. You got to put up with that. I agree. And that that's why I began my comments with the caveat. If the court considers it an important point on second, the one of the reasons I I'm not sure that it is that important a point because this is we're seeming to transgress again into questioning the subjective motives of the officer. We only get there if there's no probable cause or that there's not even a basis to find qualified immunity for probable cause. And I would just reiterate our view that even if this is a close case on the existence of probable cause, it's one that falls within that hazy border that Saucier talks about between when an officer's conduct runs afoul of the Fourth Amendment and when it does not. And on that point, I just would also like to emphasize that the district court committed a number of what I thought were multiple errors, and the clearest of which is the district court's qualified immunity analysis conflated the constitutional analysis with the qualified immunity analysis, precisely the way the Supreme Court said in Saucier that it's not to do. And a last point, counsel said that I had perhaps misstated or over or overstated the point when the when Mr. DeLorto said that he had to speak with Sheriff down. Now, I just refer to this record page three thirty five tab and which is Mr. DeLorto's deposition or declaration, which he says in declaration that when talking to the dispatcher, I didn't expect him to be there, but I need to talk to him now. And in any event, unless the court has any additional questions for me, I would be more than happy to submit at this point. OK, thank you. Here's how you will stand submitted. And. Who who ordered the.
judges: Kozinski, W. Fletcher, Bybee